UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 1:18-cr-10343-IT |
| | * | |
| JOSE AVILA, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

August 27, 2019

TALWANI, D.J.

I.   Introduction

Before the court is Defendant Jose Avila's Motion to Suppress Statements [#43] made to two federal agents on April 12, 2018. Avila contends that the interview amounted to a custodial interrogation, and that the agents never gave him Miranda warnings. Avila argues further that his incriminating statements were not voluntary. A hearing on the Motion to Suppress [#43] was held on August 15, 2019. See Elec. Clerk's Notes [#52]. For reasons discussed below, the Motion to Suppress [#43] is DENIED.

II.   Facts[1]

Avila was born on an island in the Azores, Portugal. Mem. in Support of Mot. to Suppress ("Def. Mem."), Ex. C, Affidavit of Jose Avila ("Avila Aff.") ¶ 3 [#44-3]. He grew up speaking Portuguese and his schooling was in Portuguese and French. Id. ¶ 6. Avila never learned English in a formal setting, and although he understands much of what he hears in

---

[1] The court's factual findings are based on testimony at the suppression hearing; an audio recording and transcriptions of the April 12 interview; and the affidavits and other exhibits submitted by the parties at the suppression hearing.

English and speaks English well, there are words and phrases that he does not know. Id. Avila came to the United States in 1977 and became a citizen in 1997. Id. ¶ 4. For the past 20 years, Avila has worked at EDA Staffing ("EDA"). Id. ¶ 7. EDA's principal place of business is in Foxborough, Massachusetts, but they have several locations. Id. Avila has been the general manager of the Chelsea location for the past 19 years. Id.

On April 12, 2018, around 11:30 a.m., United States Postal Inspector Fred Busch and Special Agent Joshua Stasio, IRS Criminal Investigation, arrived at the EDA's Chelsea office, where Avila works. Id. ¶ 9. The agents arrived wearing street clothes. Inspector Busch's gun was holstered under a suit jacket, but Avila noticed the gun when Inspector Busch showed Avila his badge. Id. ¶ 9. The agents told Avila that they wanted to ask him a few questions. Id. ¶ 10.[2]

Avila led the agents to his office because it was the only private place to talk. Id. ¶ 10. Avila also consented to the interview being recorded. See Gov. Tr. Apr. 12, 2018, Interview ("Gov. Tr.") 3:11-19 [#46-1]; Def. Tr. Apr. 12, 2018, Interview ("Def. Tr.") 3:21-4:6 [#44-4]. The agents recorded the interview with a handheld audio recorder. Mem. in Opp. to Mot. to Suppress, Ex. B, Busch Mem. of Interview ("Busch Interview Mem.") [#46-2]. The interview began at 11:38 a.m. See Gov. Tr. 1:11-16 [#46-1]; Def. Tr. 2:1-7 [#44-4]. At no point did the agents advise Avila of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966).[3]

---

[2] Avila testified that the agents also stated that they had a subpoena before he took them to his office, while Inspector Busch testified that he referenced a subpoena for documents, and only did so after they were in the office. This dispute is not material as it is uncontroverted that the agents gave Avila the document subpoena and told him that it was for documents once the agents were in Avila's office.

[3] Although Inspector Busch testified that, prior to the start of the recording being turned on, "Avila was advised that he was not under arrest and free to leave at any time," see Busch Memorandum of Interview, April 12, 2018 [#46-2], Avila asserts that Inspector Busch did not give this warning. See Avila Aff. ¶ 11 [#44-3]. For the purposes of this Order, the court assumes no such warning was given.

2

During the interview, the agents asked Avila questions about EDA, his role in the company, and EDA's business with C&W Services, to whom EDA provides staffing services. The agents also told Avila that they had a subpoena for records, and handed him the subpoena. Gov. Tr. 3:9-11 [#46-1]; Def. Tr. 3:21-22 [#44-4]. The page that Avila saw, Attachment A, stated that the subpoena was for documents, including documents concerning Avila. Avila Aff. ¶ 10 [#44-3]; Def. Mem., Ex. B, Grand Jury Subpoena ("Subpoena"), Att. A [#44-2]. The agents also told Avila that they had interviewed individuals at C&W regarding a possible kickback scheme involving Avila, and had already collected records and testimony regarding the scheme. See Gov. Tr. 16:16-17:2 [#46-1]; Def. Tr. 14:23-15: 9 [#44-4]. The tone of the interview was cordial and conversational, and, at one point, Avila rose to get water from the water cooler in his office. Avila ultimately responded affirmatively to a question relating to his alleged role in the kickback scheme. Gov. Tr. 73:4-74:10 [#46-1]; Def. Tr. 65:21-67:1 [#44-4].

An hour and fifteen minutes into the interview, Inspector Busch told Avila that they were "just about done" with the interview, adding that "your guy wants to come back" and "finish what he's doin[g]" (a reference to the individual who had been sitting in Avila's office when the interview started, but who had left when the interview began). Gov. Tr. 105:5-9 [#46-1]; Def. Tr. 95:7-10 [#44-4]. Avila responded "that's OK," and continued answering questions. Gov. Tr. 105:10 [#46-1]; Def. Tr. 95:11 [#44-4]. At the end of the interview, Avila told the agents he hoped he could help more. Gov. Tr. 106:23-107:6 [#46-1]; Def. Tr. 96:17-97:1 [#44-4]. The interview ended at 12:56 p.m. See Gov. Tr. 108:5 [#46-1]; Def. Tr. 97:22 [#44-4].

Avila and Inspector Busch testified that after the interview recording ended, Avila showed the agents Avila's family photographs and pictures of the Azores, where Avila grew up.

Avila now asserts that the circumstances of his interrogation were custodial, and that his admissions of his role in a kickback scheme were not voluntary. Def. Mem. at 11, 18 [#44]. He alleges that the officers utilized physical and intellectual coercion, which included asking Avila repetitive questions, and selectively showing him a page of the subpoena to create the impression that the subpoena was directed at him personally. Avila Aff. ¶¶ 10, 12 [#44-3]. Avila asserts that the agents spoke in harsh tones, and that Avila, whose first language is Portuguese, became nervous and had trouble speaking in English after prolonged questioning. Id. ¶¶ 6, 12. Avila also asserts that he did not know the meaning of the key words (such as "kickback") to which the agents referred throughout the interview. Id. ¶ 12.

IV. <u>Discussion</u>

    A. *Was the Interview a Custodial Interrogation?*

Before conducting a "custodial interrogation," law enforcement must advise a suspect of his Fifth Amendment rights by administering a <u>Miranda</u> warning. <u>United States v. Crooker</u>, 688 F.3d 1, 10-11 (1st Cir. 2012). An interview is custodial when, "viewed objectively, [the circumstances of the interview] constitute the requisite restraint on freedom of movement of the degree associated with a formal arrest." <u>United States v. Hinkley</u>, 803 F.3d 85, 90 (1st Cir. 2015) (quotations omitted). In assessing the circumstances, courts consider such factors as location, number of officers, degree of physical restraint, duration, and character of interrogation. <u>United States v. Masse</u>, 816 F.2d 805, 809 (1st Cir. 1987). A failure to give <u>Miranda</u> warnings prior to a custodial interrogation warrants suppression of the resulting statement. <u>Miranda</u>, 384 U.S. at 444; <u>United States v. Jackson</u>, 918 F.2d 236, 241 (1st Cir. 1990).

Because, "[i]n light of the objective circumstances," the facts suggest that a "reasonable person would have felt . . . at liberty to terminate the interrogation and leave," the court finds that

the April 12 interview was non-custodial. Howes v. Fields, 565 U.S. 499, 509 (2012) (internal citations, alterations, and quotation marks omitted). Avila spoke to the two agents in the "familiar or at least neutral settings" of his office, United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011), and there were no other agents or law enforcement in the vicinity. See United States v. Whitty, 688 F. Supp. 48, 61 (D. Me. 1988) (finding non-custodial interrogation where defendant was "interviewed in his own place of business, during the day, and in a private area of his own choosing," and where the officers "neither physically restrained [defendant] nor informed him that he was not free to leave."). Even though one agent's holstered gun was visible, there was no indication of any threat or use of force. See Hughes, 640 F.3d at 436 (the fact that weapons remained in holsters and were never brandished supports the district court's finding that interrogation was non-custodial). Avila did not ask to terminate the interview at any point or try to leave the room, nor did the agents tell him he was *not* free to leave. On the contrary, Avila's response ("it's fine") to Inspector Busch's offer to finish up the interview, so that Avila's colleague could return to the conference room, supports a finding that Avila continued to engage with the agents voluntarily, and that the interview was non-custodial.

Avila was not restrained at any point, and uncontroverted testimony from the hearing reflects that, mid-way through the interview, Avila got up to get water without impediment from the agents. See, e.g., United States v. Francois, 715 F.3d 21, 32-33 (1st Cir. 2013) (finding no custodial interrogation where, among other factors, the suspect was "not physically restrained nor told that he was not free to leave," and where the suspect left "as a free man" at "the conclusion of the interview."). While Avila testified that the agents asked him repetitive questions, he does not assert, nor does the evidence suggest, that the agents raised their voices toward him. See Hughes, 640 F.3d at 437 (interview was non-custodial where the agents'

5

"demeanor remained calm, the time of day (late morning) was not menacing . . . and . . . the [agents] were polite and never hectored the defendant or raised their voices."). To the extent Avila asserts that the agents "persuaded [Avila] to talk by confronting him with inculpatory evidence," (in this case, a subpoena seeking documents relating to Avila or statements suggesting that the agents had evidence against Avila) such conduct does not create a condition of custody. See Hinkley, 803 F.3d at 90.

Although Avila testified credibly that he felt uncomfortable in the presence of the agents, the test requires the court to consider the objective circumstances of the interview, not the defendant's subjective experience. Id. at 90; Howes, 565 U.S. at 509. Nor does Inspector Busch's testimony that he and Agent Stasio served the subpoena at EDA's Chelsea office (rather than the company's principal place of business in Foxborough) to try to gain information from Avila change the calculus. Hughes, 640 F.3d at 437 ("[T]he [agents'] subjective intent, uncommunicated to the defendant prior to or during the interview, is not germane to a Miranda inquiry.") (internal citations omitted). Where, as here, the defendant spoke to two agents, for less than two hours, in his place of business, after inviting them into his office to speak more privately and then declining an offer to end the interview sooner, the court finds that a reasonable person would have felt at liberty to terminate the interrogation and either leave or ask the agents to leave. Howes, 565 U.S. at 509. Accordingly, the interview was not custodial, and the agents were not required to advise Avila of his Miranda warnings at any point during the interview.

      B.    *Were Avila's Statements Made Voluntarily?*

Avila argues in the alternative that any admissions made during the interview were involuntary. The government bears the burden of proving by a preponderance of the evidence that the confession was voluntary. United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000). In

6

determining whether an admission is voluntary, courts consider the "totality of the circumstances," Hinkley, 803 F.3d at 91, and whether "[t]he will of the defendant was overborne so that the statement was not his free and voluntary act . . . ." Jackson, 918 F.2d at 241 (internal citations and alterations omitted).

Avila asserts that his admission was not voluntary because the agents badgered him repeatedly with questions, accused him of lying, and implied that the subpoena compelled Avila's testimony. Def. Mem. at 2 [#44]. However, viewed in totality, the circumstances suggest that Avila's admission was voluntary. Jackson, 918 F.2d at 241.

First, as discussed above, the conditions of the interview were "not ominous" – the "tone of the interview was cordial, its length was reasonable, and the defendant was not deprived of any essentials." Hughes, 640 F.3d at 438. The agents showed Avila a subpoena that requested, among other things, documents relating to Jose Avila. See Subpoena, Att. A [#44-2]. Although Avila argues that the agents misled Avila into believing the subpoena required his testimony, transcript and hearing testimony reflect that Inspector Busch told Avila that the subpoena was a "subpoena for documents," but that the agents "could also, if need be, issue a subpoena for testimony [ . . . ]." Gov. Tr. 36:22-37:2 [#46-1]; Def. Tr. 32:8-13 [#44-4]. Furthermore, it is undisputed that Avila had access to the Attachment A of the subpoena during the interview, if not the whole subpoena, and could have determined for himself that the subpoena requested several categories of documents, communications, and records relating to EDA and Jose Avila, among others. To the extent that the agents did seek to deceive Avila, "some degree of deception on [the part of law enforcement] during the questioning of a suspect is permissible," as long as it does not cross the line into coercion. Hughes, 640 F.3d at 439. Here, the agents were not coercive in their statements. See id. at 438 (collecting cases); Jackson, 918 F.2d at 241-42

7

(voluntary confessions must not be "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence") (internal citation omitted).

Avila also argues that his English skills limited his ability to understand the agents and to express himself. While difficulty understanding English can be a factor in determining the voluntariness of an admission, courts consider the defendant's English comprehension as part of the totality of the circumstances, including the "background, experience, and conduct of the accused." United States v. Mahmood, 415 F. Supp. 2d 13, 19 (D. Mass. 2006) (citing United States v. Garcia, 983 F.2d 1160, 1169 (1st Cir. 1993). Although Avila was never taught English in a school setting, he has worked in the United States for the past 20 years, including at a company where he routinely communicates in English, see Avila Aff. ¶¶ 6-7 [#44-3], and he testified competently in English at the suppression hearing. The transcript reflects Avila's ability to understand the agents, and to express uncertainty or hesitation when he did not understand or have an answer to a question. See, e.g., Gov. Tr. 37:10-38:8 [#46-1]; Def. Tr. 33:5-15 [#44-4]. Thus, although English may not be Avila's first language, his English skills were not so diminished as to undermine the voluntariness of his statements, particularly in consideration with the other circumstances of the interview. Compare United States v. Mahmood, 415 F. Supp. 2d at 15, 19 (finding that confession was involuntary where defendant's "grasp of the [English] language was tentative, and he often did not understand the questions put to him") with United States v. Luciano, 329 F.3d 1, 7-8 (1st Cir. 2003) (rejecting defendant's argument that confession was involuntary due to lack of English comprehension, "despite having spent twelve of his thirty years – including third through eighth grades – in the United States, despite the transcript from

his interrogation in which he indicated he understood English, and despite correcting the court interpreter as he translated during the suppression hearing.").

Avila's own conduct during and after the interview suggests that he did not "lose volitional control, nor was his will overborne." Jackson, 918 F.2d at 242. Occasional laughter punctuated the interview, and, at the end of the interview, Avila stated that he hoped he could help the agents more. Gov. Tr. 106:23-107:6 [#46-1]; Def. Tr. 96:17-24 [#44-4]. After the interview officially concluded, Avila spent time showing the agents pictures of the Azores. Accordingly, the totality of the circumstances do not suggest that Avila was coerced or reveal any "extrinsic factors introduced by the [agents] that could have distorted [Avila's] judgment about whether to speak freely to them." Hughes, 640 F.3d at 439.

IV. Conclusion

Because Avila's interview was not custodial, and his statements were made voluntarily, Avila's Motion to Suppress [#43] is hereby DENIED.

IT IS SO ORDERED.

Date: August 27, 2019 /s/ Indira Talwani
United States District Judge